MORRIS LEVINE, ET AL. *v.* LENA SCHOFER, ET AL.

[No. 64, October Term, 1944]

206

*Decided December 20, 1944.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, CAPPER, and HENDERSON, JJ.

*A. David Gomborov* for the appellants.

*William Saxon*, with whom was *David M. Brenner* on the brief, for the appellees.

GRASON, J., delivered the opinion of the Court.

This case was instituted in the Circuit Court No. 2 of Baltimore City by Lena Schofer and Isaac Schofer, her husband, against H. Lee Brill, trustee, George M. Schofer, Rebecca Schofer, his wife, the National Marine Bank of Baltimore, a body corporate, Morris Levine, and Sarah Levine. It arose out of the following facts, alleged in the second amended bill of complaint:

Isaac Schofer and Lena Schofer, his wife, owned four pieces of improved property in Baltimore City. Two were subject to ground rents and two held in fee simple. All were subject to two mortgages. On September 6, 1940, they entered into a written agreement to deed all their right, title and interest in and to said properties to their son George and his wife Rebecca, and on October 11, 1940, in conformance with this agreement, a deed was executed by them conveying these properties to the son and his wife. No money whatever passed from grantees to the grantors at these transactions. The agreement provided: "The parties of the second part will pay to the parties of the first part all rents received from the aforesaid properties, numbers 516 Pearl Street, 914 Madison Avenue, and 928 Madison Avenue (but not from 2209-2223 W. Franklin Street), during the joint lives of the parties of the first part, and after the death of either of the parties of the first part the parties of the second part will continue to pay the said rents, without deductions, to the survivor of the parties of the first part during his or her survivorship; it being distinctly understood that after the death of both parties of the first part the estate of neither of them shall have any claim whatsoever against the parties of the second part on account of the transfer of the above properties." The agreement further provides: "That parties of the second part agree to pay all taxes on numbers 516 Pearl

Street, 914 Madison Avenue, and 928 Madison Avenue, and ground rents on numbers 516 Pearl Street and 914 Madison Avenue, and to pay any and all other expenses incident to the maintenance of the said properties during the lifetime of the parties of the first part." It further provides: "That the parties of the second part will indemnify the parties of the first part from liability on account of the two aforesaid mortgages." It appears that the parents conveyed to their son and his wife all the property they possessed, in consideration that they were to receive all rents from three of the properties conveyed for their joint lives, free and clear of all taxes, ground rents and "all other expenses incident to the maintenance of said properties."

In September, 1940, the mother, according to the bill, was about sixty years old and had been in bad health for a number of years prior thereto, and the father was about sixty-three years old, afflicted with heart disease, and had been confined to his home for five years and unable to support himself and wife. The parents, in addition to George, have four children, none of whom knew of the dealings out of which grew this litigation. In September, 1940, and for a long time before, George continually importuned his sick parents to deed him their property. At the time the properties were deeded to George and his wife the rents from the three pieces thereof, which were to be collected by him and paid over to his parents, amounted to $70 per week. Since the date of the deed from his parents to him and his wife he has not paid to them the weekly sum of $70 due them, which he collected, but only paid to them $40 per week. Notwithstanding his old, sick and infirm parents remonstrated with him, he still continued to violate his duty as a son and his duty under his agreement with his parents. He retained out of these rents due his parents the sum of $30 per week, until March 5, 1942, when Mr. Brenner, a lawyer called in by the parents, wrote him about the matter. He went to see Mr. Brenner, said he would stop collecting the rents, but was evasive about turning over the properties to his parents.

After this letter dated March 5, 1942, from Mr. Brenner to George M. Schofer (the son), he displayed great activity, which further embarrased the rights of his parents to the rents from these properties. On March 6, 1942, George and his wife executed a mortgage to Morris Levine (his father-in-law) for $3,842.72, covering the properties in question. On the same day he and his wife signed a note to Sarah Levine (his wife's sister) for $800, which was reduced to judgment. On March 16, 1942, he and his wife executed a mortgage, covering three of the four properties in question, in the amount of $2,200 in favor of the National Marine Bank of Baltimore. On the 25th day of March, 1942, he and his wife executed a deed of trust for the benefit of their creditors to H. Lee Brill, trustee. The trustee and mortgagees, at the time of the conveyances to them by George and his wife, knew of the agreement between them and his parents regarding the aforesaid properties, and Sarah Levine had full knowledge of said agreement when the note was given her. All of this was without the consent of the parents. It is charged that Morris Levine and Sarah Levine knew that the agreement between and deed from the parents to George and his wife were obtained by false pretense and that they never intended to carry out their obligations under the aforesaid agreement; that the mortgage from them to Morris Levine was without consideration; that the mortgage to the Bank was made for the benefit of Morris Levine, and that the Bank, since 1937, was a creditor of Morris Levine and George M. Schofer, and knew of the agreement and deed from the parents to George and his wife. It is further averred that George and his wife failed to pay all of the ground rents, taxes, mortgage interest and principal.

All of the prayers of the bill were stricken out in open court, except the following: F, that the agreement be declared a trust for the benefit of the complainants; G, that H. Lee Brill, trustee, the National Marine Bank, Morris Levine, and Sarah Levine, be required to elect to remain lienors and be directed to carry out and per-

form any and all of the obligations and undertakings made in the agreement filed in these proceedings for the benefit of Lena Schofer and Isaac Schofer, her husband, or said defendants release and discharge their respective liens described in the bill of complaint; and, H, for general relief.

The docket entries contained in the record do not show any entries made before April 5, 1944, when the second amended bill of complaint with order of Court granting leave to file same was filed. This entry shows service admitted by A. David Gomborov, solicitor. A demurrer was filed by Morris Levine and Sarah Levine through Mr. Gomborov. This demurrer was correctly overruled. It does not appear that Mr. Gomborov represented the other defendants, and he expressly stated he did not represent them, at the argument in this Court. From this record it is impossible for this Court to know which defendants, if any, were summoned to the original bill. Mr. Sellors, vice-president of the National Marine Bank, did state he "signed the answer to the original bill of complaint", but we do not know if it was actually filed in the case. And if all of the defendants were summoned to the original bill, we cannot tell if the amended and second amended bills, in their allegations, made material departures of fact from the original bill that would require the defendants to be summoned thereto. *Miller's Equity Procedure*, Sec. 158. The general rule is that an amended and an original bill constitute a single pleading. *Miller's Equity Procedure*, Sec. 188; *Conroy v. Southern Maryland Agricultural Ass'n*, 165 Md. 494, 504, 169 A. 802.

"The amended and supplemental bill prays for service of the writ of subpoena against the new defendant only, * * * but entirely ignores the defendants named in the original bill, and fails to call for service of process * * * against them, or any of them. From the character of the amendment made by the amended bill, it is very clear that the original defendants were necessary parties to such bill; but they could not, from the very nature of the

amendment, be required to answer or plead to the same,· until they had been notified of the amended bill by service of process." *Cockey v. Plempel,* 86 Md. 181, 185, 37 A. 792, 793.

We cannot say from this record that the Court had jurisdiction over any of the parties, with the exception of Morris Levine and Sarah Levine. It may appear from the records of the court below that it had complete jurisdiction over all the parties, but this we do not know, and this case will have to be remanded.

After the demurrer of Morris Levine and Sarah Levine was overruled they filed answers, testimony was taken, and on May 8, 1944, the Court, by its decree, declared the aforesaid agreement "to be a trust and the properties described therein * * * to be held for the use and benefit of Lena Schofer and Isaac Schofer, her husband, during their joint lives and the survivor of them." It was further decreed that all of the defendants "be and they are hereby directed to perform any and all of the covenants contained in the aforesaid agreement and retain their respective liens against the properties described therein, or, in the alternative, relinquish any and all of their claims and liens against the aforesaid properties, by filing proper releases of their respective claims, with costs to the petitioners, Lena Schofer and Isaac Schofer, her husband". From this decree, Morris Levine and Sarah Levine bring this appeal.

The evidence in the case abundantly supports the allegations of the second amended bill. George M. Schofer, the son, testified in the case. He admitted for a year he had conversations with, and kept bothering, his parents to get the title to the properties. He promised to turn over all the rents to them, but after the deed was signed he admits he didn't turn over all of the rents. He states that the mortgage he executed to Morris Levine was for money loaned to him over a period of time and the last money he received from his father-in-law was about two months before he signed the mortgage. He says that the note given Sarah Levine, his sister-in-law,

was for cash she advanced to him; that the mortgage executed to the National Marine Bank was for money he owed them for some time, but this debt to the bank had been reduced to $1,100. It appears that George Schofer had been engaged in the oil business and borrowed money from his father-in-law. Morris Levine, the father-in-law, tesitfied he knew that George got the property from his parents and knew he was turning over the rents to them. He called in Mr. Gomborov. George showed Gomborov the agreement that he and his wife entered into with his parents. Mr. Gomborov then drew the mortgage from George and his wife to Morris Levine. At the same time Gomborov obtained from George and his wife a note for $800 payable to Sarah Levine, which has been reduced to judgment. Gomborov testified that he could "easily deduce that he (George) was insolvent", and he did not "ask George how he obtained the properties from his parents." Sarah Levine, called as witness, admitted she knew George got the properties from his parents and that they were to receive the income for life and the properties were to go to George and her sister after the death of his parents. Morris Levine testified that between November 2nd and November 19, 1940, he advanced cash, aggregating $600, to George M. Schofer, for which Schofer gave him three checks drawn to his order on the National Marine Bank of Baltimore. These checks have never been cashed. His testimony is completely silent as to whether he knew or did not know of the agreement in question at the time he made these advances. If he did not know about the agreement it was perfectly easy for him to say so. In view of the fact that he was the father-in-law of George M. Schofer and loaned him various sums over a long period of time, it is a fair inference he knew of the agreement when this cash was advanced. It is apparent from the record that Morris Levine, Sarah Levine and their counsel, Mr. Gomborov, at the time the mortgage and note were given, knew of the agreement between George and his wife and his parents, and these instruments are subordinate to that

agreement. The mortgage to the National Marine Bank is also subject to that agreement. The vice president of that Bank testified that George and Rebecca Schofer, at the time of its execution, obligated themselves to obtain a waiver of their parents' interest. He, therefore, knew of the agreement at the time the mortgage was executed.

It is plain from the testimony in this case that for a year or more George M. Schofer persistently bothered and importuned his parents to deed him their properties. At that time his mother was sixty years of age and her husband was older than she. Both of them were sick and the collecting of the rents from their properties, paying the ground rents and taxes, and looking after repairs, was a heavy burden to the aged and sick parents. They finally succumbed to their son's persuasion and entered into the agreement with him. We think that this case discloses a confidential relationship between the son and his parents, and it is considered that immediately after the execution of the deed the son violated his agreement in that, instead of paying to his parents the rents he collected, which he was bound to pay them, he kept therefrom, over the objection of the parents, $30 per week. We are of the opinion the evidence shows that the son was actuated by fraud to cheat his parents at the time he entered into the agreement. They placed every confidence in their son, which was breached by him from the time of the respective dates of the agreement and the deed in question, and which he continued to breach until this suit was instituted. There is no question that the deed from the parents to the son was impressed with a trust which arose *ex maleficio*.

" 'There is * * * a class of trusts which arise *ex maleficio*, and equity in order to reach the possessor of what in conscience belongs to another turns him into a trustee'. * * * And a violation of a parol agreement to hold property in trust for another may, under certain circumstances, be sufficient evidence of fraud to raise a trust in favor of the promisee * * *, and such an agreement may be inferred from the acts and conduct of the parties,

as well as from their spoken words. * * * 'To avoid the injustice arising from the repudiation of a parol trust, courts of equity have frequently seized upon the slighttest circumstances connected with the procurement of the conveyance to avoid the operation of the statute of frauds,' and 'perhaps the most satisfactory inference of a fraudulent intent on the part of a grantee is to be derived from his activity in procuring the conveyance; and in the instances hereinafter detailed, in which equity has compelled the performance of the promise, it will be found that the grantee made some representation, or otherwise took an active part in inducing the grantor to convey.' " *Lipp v. Lipp*, 158 Md. 207, 148 A. 531, 534.

In the case quoted, a mother conveyed property to a son in 1917, upon the distinct understanding with him that she would have a right to live in it as her home for the residue of her natural life, and that the son would continue to treat her with filial love and affection as he had theretofore manifested towards her, and maintain and support her for the rest of her life at his expense. In February, 1927, he evicted her. It was held in that case that the facts were "sufficient to support the inference that, when the appellant entered into the agreement by which he induced the appellee to convey her property to him, he never intended to perform it, but used it as a mere bait to entice her into parting with her property."

It was further stated in that case: "that a court of equity has, under such circumstances, the power to relieve the appellee from the fraud thus perpetrated upon her, by turning the appellant into a trustee *ex maleficio* of the property for her benefit, and directing a reconveyance of it to her, appears to be well settled, not only by the decisions of this court to which we have referred, but by the general weight of authority."

See also: *McIntyre v. Smith*, 154 Md. 660, 141 A. 405; *Clark v. Clark*, 139 Md. 38, 114 A. 722; *Jasinski v. Stankowski*, 145 Md. 58, 125 A. 684; *Coyne v. Supreme Conclave*, 106 Md. 54, 66 A. 704; *Mountford v. Mountford*, 181 Md. 212, 29 A. 2d 258.

In *Grimes v. Grimes*, 184 Md. 59, 40 A. 2d 58, Judge Delaplaine quoted Justice Cardozo. The quotation is apt in this case: "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."

All of the parties to this case, at the time of their respective transactions with George M. Schofer and Rebecca Schofer, his wife, knew of the relationship existing between them and the parents with respect to the properties in question. These parties, therefore, acquired no rights that can affect the interest of the plaintiffs in these properties.

We are remanding this case, without reversal or affirmance, to the Court below for further proceedings, for reasons we have given above. If we were sure that all of the parties to this proceeding were properly in court, we would reverse this case and send it back with the direction that a trustee be appointed to convey to the plaintiffs these properties, free and clear of any supposed interest that the defendants, and each of them, may have therein.

> *Case remanded, without reversal or affirmance, for further proceedings, with costs to appellees.*