Mary BOYD, Plaintiff,

v.

Richard P. CLARK and Mary Lee Clark,
Defendants.

Court of Chancery of Delaware,
New Castle.

May 7, 1970.

Henry A. Wise, Jr., Wilmington, for
plaintiff.

Harvey B. Rubenstein, Wilmington, for defendants.

MARVEL, Vice Chancellor.

On July 28, 1953, according to her complaint, plaintiff, who was then unmarried, purchased the home in which she and her husband,[1] John L. Boyd, have long resided, located at 103 Rita Road, Chelsea Estates, in New Castle. At the time of settlement, however, because of the facts and circumstances hereinafter related, instead of title to such property being placed in plaintiff's name as the buyer, a conveyance of title was made to plaintiff's son-in-law and daughter, the defendants Richard P. Clark and his wife Mary.

On November 9, 1952, plaintiff had paid over to Chelsea Estates, the seller of the residence in issue, a $50 deposit. She later paid the balance on the agreed-upon down payment in the amount of $648.25 on December 12, 1952. On March 6, 1953, she deposited with the seller the sum of $161.50 in payment for the installation of thermopane windows in the premises to be purchased. Receipts for these amounts were given to Mr. Clark, but he concedes that plaintiff advanced the moneys. The balance of purchase moneys required for the purchase was advanced by Wilmington Trust Company as mortgagee under the following circumstances. Mrs. Boyd testified that she had been informed that as a widow she could not obtain a mortgage and that in any event her age was another negative factor in obtaining favorable action should she individually apply for such a loan. Accordingly, aware of the fact that her son-in-law had served in the armed forces of the United States during World War II, and, though entitled to, had not applied for what is familiarly known as a G.I. mortgage loan, she went to him with

the request that he apply for such a comparatively low cost loan for the purpose of financing for her the purchase of the property here in issue. Mr. Clark, who at the time was residing with his family on a rented farm near Lenape, Pennsylvania, apparently first demurred but later agreed to apply for such a loan. Thereafter, a twenty-five year U.S. government backed mortgage was obtained in the gross amount (principal and interest) of $9,950.00, thereby making the purchase in question possible. Mrs. Boyd professes to have been unaware at the time that the indirect procurement of the benefits of such a mortgage for her, a non-veteran, would be, to say the least, irregular. Mr. Clark, on the other hand, who takes the position that he and his wife are beneficial owners of as well as title holders to the house in question, testified that he was told at the Veterans Administration office that it was permissible to have his mother-in-law move into the house to be purchased, although he apparently signed a form agreeing to the contrary. The bond and warrant evidencing such a loan as well as the mortgage were duly executed by the Clarks and the purchase was consumated in a transaction involving a smaller down payment and a mortgage loan at a lower interest charge than would have been required had Mrs. Boyd been able to secure a mortgage on her own credit. However, it is conceded that the deposit and down payment on the property to be purchased, all subsequent mortgage payments to date, as well as all payments for tax assessments, insurance premiums,[2] water installation costs and charges, home improvements (including the addition of a dining room, the enclosing of a front porch, and the black-topping of the driveway to the house) were made by either Mr. or Mrs. Boyd. Total moneys put into the house by the Boyds as of the time of trial approxi-

1. It is not clear on the record whether the Boyds were married in May, 1954, or May, 1955.

2. Significantly, a homeowners' insurance policy for the property in issue covering

the period from February 10, 1962 to February 10, 1965 was issued in the Boyds' names, however, other so-called insurance was carried in the name of the Clarks, premiums therefor being included in the Boyds' mortgage payments.

mate some $17,000, although Mr. Boyd recognizes his wife as the beneficial owner of the property.

The defendants admit that they have expended no moneys towards the acquisition, improvement, or maintenance of the house in question and have contributed no labor other than to help install so-called jalousies on one occasion. They take the position, however, that they supplied credit for financing the balance of purchase moneys for the acquisition of the house by executing and thus becoming liable on a $9,950 bond and mortgage, thereby forfeiting the right to obtain a similar mortgage loan on any other property they might wish to purchase in the future although concededly the loan here involved could have been transferred to such other property.[3]

As stated in Vol. 5, Scott on Trusts § 404.1:

"A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest in the property."

The holding in Harvey v. Pennypacker, 4 Del.Ch. 445, is as follows:

"And first, was there *a resulting trust?* It will greatly simplify our investigation on this point to observe at the outset several will settled principles in the law of resulting trusts. One is this: That to raise a trust of this nature there must have been *actual payment of the purchase price or liability incurred for it,* on the part of the *cestui que trust.*

\*   \*   \*   \*   \*   \*

"Another principle is that the payment of the purchase money must, in order to raise a resulting trust, have been made, or the liability incurred *as part of the original transaction of purchase,* and not pursuant to any subsequent agreement between the parties; for a resulting trust must have been coeval with the purchase and have attached to the legal estate when it was taken under the deed."

Finally, there is " \* \* \* the natural presumption that, in the absence of evidence to the contrary, the person who supplies the purchase price intends that the property shall inure to her own benefit, and that a conveyance in the name of another is for some mere incidental reason \* \* \*", Greenly v. Greenly, 29 Del.Ch. 297, 49 A.2d 126.

Plaintiff contends that it was clearly understood between her and her daughter and son-in-law at the time the latter agreed to apply for a government mortgage loan to finance the purchase of the house here in issue that the property to be acquired would be plaintiff's and that she would be fully responsible for paying all monthly mortgage installments as well as all other expenses pertaining to the transaction. However, this commitment was obviously *not reduced to writing.* Defendants, on the other hand, claim that the deposit and down payment on the house, which were admittedly moneys furnished by plaintiff, constituted loans made to them by plaintiff. There is no evidence, however, that such alleged advances have ever been repaid. They also emphasize that Mr. Clark risked his credit in the transaction with the alleged understanding that the house to be acquired would belong to him and his wife and that plaintiff was to have what amounted to a mere life estate in such property in return for which she agreed to assume full responsibility for the initial and continuing costs of the transaction, it being the parties' agreement, according to defendants, that plaintiff would have full responsibility for future mortgage installment payments as well as for payment of the costs of any

---

3. While Mr. Boyd as a veteran was also entitled to apply for a G. I. mortgage loan, it is not clear why a refinancing of the Clark mortgage was not accomplished by such an application, although, of course, plaintiff alone claims to hold the entire beneficial interest in the property at stake.

improvements made to the property. In other words, defendants, although not committed to any outlay of moneys for the acquisition of the property other than that involved in their contingent mortgage obligation in the event of default on plaintiff's part (which has not occurred), deny that any beneficial interest in the house is held by plaintiff.

■ I have considered the testimony adduced at trial, including that of relatives of the defendants, and, for the reasons hereinafter stated, am of the opinion that the 1952 agreement between the parties was that plaintiff ab initio was to become obligated to pay for the house in which she has resided since 1953. She must therefore be deemed the beneficial owner of the house in issue subject to her accounting to defendants for their contribution towards such purchase and upon relieving them from any commitment on their formal mortgage obligation.

In so deciding I have concluded that the actions and attitudes adopted by the parties following settlement on the house purchase here involved support the testimony adduced on behalf of plaintiff, who, because of her poor health and advancing age, did not, while on the stand, consistently present her case in a vigorous and clear manner. On the other hand, in light of their obvious interest, I can not accept the recollections of Mr. Clark's sister and those of the Clarks' daughter concerning conversations they allegedly overheard some seventeen years ago, considered in light of the former's failure to pinpoint the date of conversations allegedly listened to by her as well as the latter's tender age at the time of her alleged presence at such a conversation. By the same token I have come to a like conclusion that Mr. and Mrs. Clark have perhaps inadvertently permitted the course of events, which have built up a substantial equity in the property here in issue, to color their memory concerning the original understanding of the parties, which was, I believe, that plaintiff was to be responsible for all payments having to do with the acquisition of the house in issue and was thus to be its beneficial owner. And while defendants belatedly took the position that the mortgage installment payments made by plaintiff were in effect a form of rental paid for her use of the property in dispute, none of such hypothetical income was reported to the taxing authorities until after this suit had been filed and defendants' depositions had been taken. Accordingly, I am satisfied that the reporting of approximately $1,000 as so-called rental income allegedly received by the Clarks from plaintiff for 1968 was a tardy and futile effort to convince the Court that it was not the understanding of the parties at the inception of the transaction in dispute that plaintiff was to be the beneficial owner of the house in question. Finally, I am persuaded that the actions and attitudes of the parties towards the property following plaintiff's assumption of responsibility for payment for the house constitute that type of clear, full, and satisfactory evidence required to establish a resulting trust, Harvey v. Pennypacker, supra.

■ Defendants argue, however, that on several occasions, starting at least as far back as 1957, requests were made to Mr. Clark by Mr. Boyd that title to the property in issue be conveyed to plaintiff and that Mr. Clark refused on the ground that defendants were the actual owners of the house. Having considered the testimony, I am satisfied that first of all Mrs. Boyd did not participate in such conversations and that, in any event, such conversations were inconclusive and casual. In short, it was not until 1968, when it became apparent that Mr. Boyd's employment would require him to move to Smyrna, that a request that the house be sold for plaintiff's benefit was made, which request, for the first time, constituted an actual demand by plaintiff for a recognition of her interest in the property. Upon refusal by the defendants to consummate such a sale, this suit was promptly filed. Plaintiff's action is accordingly not barred by laches.

Finally, a special problem arises in the case at bar, namely that attributable to the fact that defendants, rather than plaintiff, became formally obligated to pay the mortgage installments designed ultimately to clear the property in issue from mortgage debt. Thus, it cannot be said that actual payment of the purchase price for the property in issue was made by plaintiff. I am persuaded, nonetheless, that plaintiff obligated[4] herself to pay such mortgage and that the course of conduct followed by the parties subsequent to settlement establishes that such an understanding was reached despite the absence of a written commitment by plaintiff, such informality being consistent with the parties' treatment of the entire transaction in dispute. Having formally obligated themselves on the bond, warrant and mortgage which made the purchase in issue possible, thereby forfeiting Mr. Clark's right to apply for a G.I. mortgage loan on another property, defendants are, however, entitled to have their contribution to the purchase of plaintiff's home taken into account upon the entry of an order directing conveyance of title to 103 Rita Road, Chelsea Estates, New Castle, by defendants to plaintiff's nominee. Compare Bullen v. Davies, 42 Del.Ch. 265, 209 A.2d 81. It follows that a further hearing must be held to evaluate defendants' contribution to the purchase made by plaintiff, including the additional expense incurred by the former in later land acquisitions as a result of allowing plaintiffs to use Mr. Clark's G.I. mortgage credit.

Finally, I conclude that there is no evidence that plaintiff has forfeited her right to seek equitable relief in this Court by reason of having caused title to the property in dispute to be placed in the names of defendants for the express purpose of delaying and defrauding creditors, Rentoul v. Sweeney, 15 Del.Ch. 302, 137 A. 74.

On notice, an order may be submitted directing defendants to convey to plaintiff's nominee title to property situate at 103 Rita Road, Chelsea Estates, New Castle, such conveyance to be made subject to terms which will extinguish defendants' obligation on the present mortgage and bond executed by them upon purchase of the house in 1953, and after defendants' contribution to such 1953 purchase has been evaluated. The net proceeds of such sale will then be remitted to plaintiff.

---

4. See Harvey v. Pennypacker, supra.